IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**DECLARATION IN SUPPORT OF VERIFIED COMPLAINT**

Under 28 U.S.C. § 1746, I, Robert W. Drace, Task Force Officer ("TFO"), Drug Enforcement Administration ("DEA"), United States Department of Justice, make the following unsworn declaration, under the penalty of perjury, in support of the Verified Complaint to which this declaration is attached:

**I.      Introduction**

1.      This declaration is made in support of a Verified Civil Complaint for forfeiture of property seized pursuant to a valid traffic stop.  The Defendant Property is subject to forfeiture under 21 U.S.C. § 881 and 18 U.S.C. §§ 981(a)(1)(A) and (C) because the Defendant Property is involved in or constitutes the proceeds of drug trafficking and was being transmitted by courier, in violation of 21 U.S.C. § 841 (drug trafficking) and § 846 (drug conspiracy), and/or 18 U.S.C. § 1960 (unlicensed money transmitting businesses).  This declaration is based upon my personal knowledge and experience obtained as case agent in the above case and information I have received from other law enforcement officials.

**II.      Declarant's Background and Experience**

2.      I am employed by the Harrison County Sheriff's Office and have been assigned as a DEA TFO for approximately 11 years.  I currently work in the Gulfport Resident Office, where I investigate criminal and civil violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq*.  I have received specialized training in laws relating to the enforcement of the Controlled Substances Act and have testified in judicial proceedings for violations of the Controlled Substances Act.

1



3.  Since my assignment as a DEA TFO, I have participated in debriefing dozens of defendants, informants, and witnesses who had personal knowledge about narcotics, narcotics trafficking, and methods of narcotics distribution. I have participated in all aspects of a drug investigation, including conducting surveillance, executing search warrants, executing arrests, working with confidential informants, and using court-ordered eavesdropping devices. As a result of my assignment, and by virtue of my employment as a law enforcement officer, I have performed and continue to perform various duties, which include but are not limited to:

    a.    Working in an undercover capacity to purchase illegal narcotics;

    b.    Working as a surveillance agent to detect and record movement of persons known to be or suspected of being involved in illegal drug trafficking; and

    c.    Working as a case agent, directing investigations of various illegal drug traffickers and complex organizations, located in various states and foreign countries, where those conspirators were illegally importing, possessing, and distributing illegal drugs within the United States.

4.  Through training and experience, and through the training and experience of other narcotics agents with whom I have talked, I have learned the following:

    a.    That criminal organizations, including large-scale drug traffickers, maintain and handle large amounts of United States currency in order to finance their ongoing illicit businesses;

    b.    That it is common practice for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in locations within their residences, vehicles, and/or place of business to conceal them from law enforcement authorities;

    c.    That persons involved in large-scale drug trafficking conceal in their residences, vehicles and businesses caches of drugs, large amounts of currency, and evidence of financial transactions relating to the obtaining and secreting of large sums of money acquired from engaging in narcotics-trafficking activities;

    d.    That it is a common practice for large-scale drug traffickers to travel to distribution areas to facilitate their trafficking; that after purchasing drugs, the drug traffickers will transport, or cause to be transported, drugs to other areas for distribution; and that the methods of transportation include, but are not limited to, rental and privately-owned automobiles;



e. That traffickers use vacuum-sealed bags, tape and/or rubber bands to bundle their illegal proceeds for transport back to source destinations and/or for ease in purchasing illicit controlled substances. Bundled cash may also be concealed in clothing or luggage or hidden in mechanical or electronic traps in the vehicle, depending on the smugglers' sophistication;

f. That money couriers, individuals specializing in the transportation of money rather than narcotics, take a percentage of the transported proceeds;

g. That, as a general rule, illegal drugs are transported from source cities, like those in the southwest or western regions, and to primary U.S. drug markets, where there are large drug user populations and where drugs are further distributed to smaller markets;

h. That traffickers travel to source cities where marijuana is legalized (such as Seattle, Washington) and of high quality, and bring those drugs back to consumer cities (such as Mobile, Alabama, where marijuana is more heavily regulated) where they command a sale price of 300-400% the suppliers' price;

i. That traffickers are known to bring large sums of currency that is often pooled together from multiple suppliers, leaving the possessors unaware of the actual amount of currency;

j. That the purchased marijuana is often sent back in large suitcases through checked baggage. Traffickers also solicit multiple, often random individuals, to travel on these trips to increase the amount of luggage for concealing marijuana which also draws less suspicion; and

k. That the Courts have recognized unexplained wealth is probative evidence of criminal violations by pecuniary gain, in particular trafficking in controlled dangerous substances (*see United States v. Barnes*, 604 F.2d 121, 147 (2 Cir. 1979)).

III. **Items to be Forfeited to the United States of America**

5. The Defendant Property sought for forfeiture include the following assets[1]:

| Asset ID | Asset Description |
|---|---|
| 21-DEA-680740 | $9,500.00 U.S. Currency, seized from Mondale Antwon Busby |
| 21-DEA-680747 | $60,200.00 U.S. Currency, seized from Jimothy Cordell Spears |

---

[1] Because no claims were filed as to the $16,110.00 U.S. Currency (21-DEA-680745) seized from Mondale Antwon Busby during the same traffic stop, that asset is not included in the instant complaint. Likewise, no claims were filed as to the $6,720.00 U.S. Currency (21-DEA-680743), also seized from Busby, which was administratively forfeited on September 23, 2022.

3



which were seized on July 13, 2021, as the result of a traffic stop on Interstate 10 westbound near mile marker 19, Pass Christian, Harrison County, Mississippi.

IV.    **Facts and Circumstances**

6.    On Tuesday, July 13, 2021, at approximately 5:10 p.m., Harrison County Sheriff's Office Deputy Josh Macko, assisted by DEA TFO Chris Sexton, stopped a black Dodge Ram pickup for a careless driving violation near mile marker 19 of Interstate 10 westbound in Pass Christian, Mississippi.  The pickup, bearing Kentucky license plate ABD388, was registered to EAN Holdings LLC, d/b/a Enterprise Rent-a-Car.

7.    Deputy Macko approached the pickup's driver, identified as Mondale Antwon Busby ("Busby"), Jimothy Cordell Spears ("Spears"), the front seat passenger, and Willie Royce Robinson ("Robinson").  As Deputy Macko was talking to Busby and explaining the reason for the traffic stop, Busby displayed a heightened level of nervousness, evidenced by the uncontrollable shaking of his hands.  Busby admitted to the traffic violation and explained that he was traveling from Mobile, Alabama and trying to get to the New Orleans Airport to catch a flight and that he only had an hour until his boarding time.[2]  Busby produced an electronic rental agreement for the vehicle and stated that he was flying to Seattle, Washington.

8.    While standing at the driver's side window, Deputy Macko could smell the odor of burned marijuana coming from the pickup's interior.  Deputy Macko also observed four oversized suitcases in the truck's bed.

9.    Deputy Macko advised Busby that he would only issue a warning citation and returned to his patrol car to conduct police databases checks.  While waiting for Busby's

---

[2] It is approximately 80 to 90 minutes from Pass Christian, Mississippi to the New Orleans Airport.

4



information to return from dispatch, Deputy Macko again approached the pickup and confronted Busby about the marijuana odor.  Busby admitted to smoking marijuana in Mobile, Alabama prior to leaving, but stated that he did not currently possess any marijuana on him or in the vehicle.  Deputy Macko had all the occupants exit the pickup and conducted a probable cause search of the vehicle, locating a large sum of U.S. Currency (later determined to be $9,500.00) from the vehicle's center console.

10. Deputy Macko reported his findings to TFO Sexton, who advised that Deputy Macko should conduct a more extensive search.  Deputy Macko started by searching the luggage in the rear of the truck.  Busby asked if Deputy Macko had to search all the luggage and Deputy Macko advised that he had probable cause to search the luggage and all contents of the vehicle.  While searching a gray suitcase, which Spears had identified as his own, Deputy Macko discovered that the suitcase contained a smaller suitcase within it.  The smaller suitcase contained blue jeans for an adult male, random baby clothes, and a Nike shoe box.  The shoe box contained a pair of Nike shoes, each stuffed with an undetermined amount of U.S. Currency.  Deputy Macko also found an undetermined amount of U.S. Currency beneath the small suitcase's lining.  All the currency (later determined to total $60,200.00) was packaged in separate bundles banded with rubber bands.

11. A second suitcase, identified as belonging to Busby, contained another sum of U.S. Currency (later determined to be $16,110.00), which was concealed within two different pairs of jeans.  These bundles of currency were also separated by rubber bands.

12. Starting with Busby, as the driver of the pickup, Deputy Macko questioned each man, after reading all three subjects the *Miranda* warning.  After Busby estimated that he had about $17,000.00, Deputy Macko observed a bulge in Busby's pocket and recovered an

5



undetermined sum of U.S. Currency (later determined to be $6,720.00).  Busby explained that he was traveling to Seattle for a day or two and planned to go shopping because he was into fashion.

13. Deputy Macko next questioned Spears, who denied any knowledge of any money in his luggage and denied knowledge of the shoes inside the luggage.  Spears also made no mention or claim of ownership of the money in the console.

14. Finally, Deputy Macko questioned Robinson, who stated that he did not know Spears personally, but Busby was like his grandson.  Robinson said that Busby had asked if he wanted to fly to Seattle with him and arranged for his flight to be paid.  Robinson stated that they were going to be in Seattle for three to four days.

15. After Deputy Macko and TFO Sexton collected and secured all the currency, TFO Sexton notified me of the seizure.  I advised him to transport all the subjects to the DEA Gulfport Resident Office for further investigation, and upon arrival, Deputy Macko turned over all the evidence and currency that he had collected to me.  I then summoned Harrison County Sheriff's Office K-9 Deputy Russell Hubbard and Ronin, his narcotics detecting K-9.  Deputy Hubbard used K-9 Ronin to conduct a sniff of the exhibits in a controlled environment, resulting in a positive alert for the presence of the odor of a controlled substance on each individual exhibit.

16. I then interviewed Busby, Spears, and Robinson separately regarding their ownership and knowledge of the currency.

17. Busby claimed that all the currency belonged to him and that it totaled $17,000 to $18,000, but he was unsure of the exact amount because Spears had packed it in the suitcase for him.  Busby explained that he had the money packaged in the luggage to avoid having to declare it at the airport and that the currency was collected over time through sports betting, although he had no documentation to substantiate his claim.  Busby stated that he earned $12/hour as a site



services laborer at a shipyard. When I confronted him that, based on the monthly expenses he named, I estimated his expenses to exceed his income by $1,000 every month, Busby admitted that he had not been employed at this shipyard since 2016 and is currently unemployed.

18. Busby claimed that he planned to visit his aunt, "Mrs. Net" in Seattle but could not provide her name, address, or any other itinerary items as in hotel rooms, activities and had no planned return date as he only possessed a one-way ticket. He said that Spears is an acquaintance that he recently met and planned this Seattle trip with him for no explainable reason other than to visit Seattle. Busby stated that Robinson is a friend of the family who volunteered to accompany them on the trip. Busby admitted to being an avid user of marijuana but denied trafficking in marijuana.

19. Spears told me that he barely knew Busby or Robinson and coincidentally learned, through mutual friends, of them traveling to Seattle at the same time he was expecting to leave from Mobile, Alabama. Spears claimed to have had his ticket booked separately and was merely catching a ride to the airport back to Seattle where he now lives, although he said he was going to hang out with Busby and Robinson in Seattle because of their ties to Mobile, Alabama. Spears denied any knowledge of the currency, except for the approximately $2,300.00 in his wallet, which was not seized. As the conversation continued, Spears displayed a heightened level of nervousness—refusing to make eye contact, shaking his hands uncontrollably, and diverting from answering questions—and became withdrawn when asked about his address, claiming to be homeless with no set address. When I asked Spears about the $2,300.00 U.S. Currency in his wallet, Spears claimed that he worked as a general day laborer, usually earning $18.00 an hour. Spears concluded further disassociating himself from all the currency (except the money in his wallet) and from any wrongdoing.

**EXHIBIT A**

20.     I then spoke to Robinson who stated he did not know Spears at all, but that Busby was like a grandson to him through his friendship with Busby's parents. Robinson stated that Busby invited him to go on the trip and that he declined as he could not afford to take the trip. Robinson then stated that he learned that his other "nephew" (referring to Busby) purchased his airline ticket so that he could make the trip. Robinson had no currency and related he expected all his expenses were going to be funded by Busby or his nephew, Michael Webb, who had traveled separately to Seattle. Robinson was unemployed and claimed to only receive approximately $730.00 a month through government benefits.

21.     I examined the three men's criminal histories and found that Busby had no identifiable criminal history while Spears and Robinson both had multiple arrests involving possession of controlled substances. TFO Drace furthered queried the individuals through the Mobile Resident Office who were currently investigating a large-scale marijuana drug trafficking organization and discovered that Busby had been identified as a member of that organization.

22.     All three men were released with the rental vehicle pending further investigation. No drugs, firearms, or contraband were located or confiscated during this investigation. As witnessed by TFO Sexton, I seized the following as proceeds of narcotics sales:

      a.     $9,500.00 U.S. Currency seized from the pickup's center console;

      b.     $6,720.00 U.S. Currency seized from Busby's pants pocket;

      c.     $16,110.00 U.S. Currency seized from the jeans in the suitcase claimed by Busby; and

      d.     $60,200 U.S. Currency seized from the smaller suitcase within a suitcase claimed by Spears and hidden within the Nike shoes and beneath the lining of the suitcase.

As witnessed by TFO Sexton, I secured all four sums of currency in the DEA Gulfport Regional Office vault for safekeeping.



23. On July 14, 2021, TFOs Chris Sexton and I took the four sums of currency from the DEA vault to First Bank in Gulfport, Mississippi to obtain an official count. The combined amount of the four sums was $92,530.00.

24. Pursuant to 18 U.S.C. § 983(a)(1), starting on September 9, 2021, DEA began sending direct notice to Busby, Spears, Robinson, and EAN Holdings LLC, and began publication of administrative forfeiture notice on September 27, 2021. However, the direct notice process was complicated by COVID and by the fact that Spears provided an apparently invalid address during the traffic stop. On March 29, 2024, the DEA determined it needed to re-notice Spears, as the results of the original direct notice to Spears appeared to be inconclusive.

25. On May 14, 2024, Spears filed—through an attorney—administrative claims with the DEA, alleging that the $9,5000.00 U.S. Currency (21-DEA-680740) and $60,200 U.S. Currency (21-DEA-680747) were his property. On June 3, 2024, the DEA referred these claims to the U.S. Attorney's Office.

## V. Conclusion

26. Based on these findings, I determined that probable cause existed to seize the currency as being illicit proceeds or involved in drug trafficking. This determination was made through several factors, including: (1) travel in a rental car to an out-of-town airport from a consumer city to a known source city; (2) subjects with large sums of currency who were unaware of how much cash they had; (3) traveling companions who did not seem to know each other well; (4) the subjects' inconsistent and implausible stories; (5) subjects with large suitcases but little suitable clothing for their trip; (6) the subjects' nervousness during the traffic stop and subsequent interviews; (7) subjects' failure to account for the large amount of currency, especially given their limited sources of income; (8) the positive K-9 alert to the four sums of

**EXHIBIT A**

currency; (9) Busby's admitted drug use and Spears' and Robinson's criminal drug histories; and (10) Spears's denials concerning the currency, other than the cash in his wallet, which was not seized.

27. The results of this investigation support my reasonable belief that the government can meet its burden of proof that the Defendant Property is directly related to and/or derived from the illicit distribution of controlled substances. This determination was made on the facts and circumstances presented above.

28. I reasonably believe, based on the above-listed facts and circumstances, that the Defendant Property was intended to facilitate or used to further a drug crime, or is directly related to drug proceeds of Spears or his associates, in violation of 21 U.S.C. § 841 (drug trafficking) and § 846 (drug conspiracy) and/or 18 U.S.C. § 1960 (unlicensed money transmitting businesses), and is therefore subject to forfeiture to the United States of America under 21 U.S.C. § 881 and 18 U.S.C. §§ 981(a)(1)(A) and (C).

29. I declare, pursuant to 28 U.S.C. § 1746, that the foregoing is true and accurate to the best of my knowledge and belief.

Executed this _____th day of June 2024,

                                                            _____
                                                            Robert W. Drace
                                                            Task Force Officer
                                                            Drug Enforcement Administration



currency; (9) Busby's admitted drug use and Spears' and Robinson's criminal drug histories; and (10) Spears's denials concerning the currency, other than the cash in his wallet, which was not seized.

27. The results of this investigation support my reasonable belief that the government can meet its burden of proof that the Defendant Property is directly related to and/or derived from the illicit distribution of controlled substances. This determination was made on the facts and circumstances presented above.

28. I reasonably believe, based on the above-listed facts and circumstances, that the Defendant Property was intended to facilitate or used to further a drug crime, or is directly related to drug proceeds of Spears or his associates, in violation of 21 U.S.C. § 841 (drug trafficking) and § 846 (drug conspiracy) and/or 18 U.S.C. § 1960 (unlicensed money transmitting businesses), and is therefore subject to forfeiture to the United States of America under 21 U.S.C. § 881 and 18 U.S.C. §§ 981(a)(1)(A) and (C).

29. I declare, pursuant to 28 U.S.C. § 1746, that the foregoing is true and accurate to the best of my knowledge and belief.

Executed this __3__rd day of July 2024,

Robert W. Drace
Task Force Officer
Drug Enforcement Administration

**EXHIBIT A**